J-S34033-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF A.M.J. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: D.A.J., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 486 WDA 2023 |

Appeal from the Order Entered February 9, 2023
In the Court of Common Pleas of Westmoreland County
Orphans' Court at No. 064-2022

BEFORE: LAZARUS, J., STABILE, J., and MURRAY, J.

MEMORANDUM BY MURRAY, J.:                **FILED: October 20, 2023**

D.A.J. (Father) appeals from the order granting the petition of the Westmoreland County Children's Bureau (WCCB) and terminating his parental rights to A.M.J. (Child).[1]  We affirm.

Child was born in November 2016.  The orphans' court explained:

> The factual history of this case began with the WCCB seeking emergency custody of the Child and her siblings in early June 2020, after Mother indicated to the WCCB that she was unable to provide appropriate care for the physical wellbeing of the children, was facing mental health issues, and had recently been charged criminally with possession of drug paraphernalia. The Order of Adjudication, dated July 21, 2020, indicated that Father was incarcerated but anticipated being released in a matter of months.  At the time of the disposition of the dependency

---

[1] Child's mother, T.L.D. (Mother), voluntarily relinquished her parental rights. ***See*** Orphans' Court Opinion, 5/24/23, at 1-2.  Mother "indicated through her counsel that she intended to consent to Child being placed for adoption," and executed her consent on June 15, 2022.  ***See id.*** at 1; N.T., 2/2/23, at 8.

matter, and at each of the subsequent permanency review hearings, Father remained incarcerated. The WCCB produced a certified copy of Father's criminal history detailing his periods of incarceration. It appears from the record that Father has been incarcerated at Criminal Docket No. CP-65-CR-1135-2020 since March 11, 2020, and, if he serves his maximum period of incarceration, may not be released until 2030. Further, Father has been incarcerated since November 3, 2017, with the exception of a thirty-day period from February to March 2020.

The WCCB petitioned for involuntary termination on September 1, 2022, and a hearing was … scheduled for February 2, 2023.

Orphans' Court Opinion, 5/24/23, at 3.

## Termination Proceedings

Child was represented at the termination hearing by Dorean Petonic, Esquire. Attorney Petonic "placed into the record … that Child's legal and best interests were not such that [Attorney Petonic] would be conflicted in representing them to the [orphans' c]ourt." Orphans' Court Opinion, 5/24/23, at 1; *see also* N.T., 2/2/23, at 6.

*WCCB Caseworker*

WCCB caseworker Jeffrey Knox testified to being assigned to the family's case in July 2020, after Mother advised the WCCB that she was unable to care for Child. N.T., 2/2/23, at 7-8. At the time, Father was incarcerated in Westmoreland County Prison. *Id.* at 8. Mr. Knox stated that Father "has been incarcerated throughout the case." *Id.* at 100.

Mr. Knox testified to communicating with Father about the family service plans. *Id.* at 89. According to Mr. Knox, Father did not participate in the

family service plans. *Id.* Mr. Knox stated that visitation between Father and Child was "attempted via the Children's Institute." *Id.* at 91. Mr. Knox relayed that Father wanted visitation, but "received blank screens on his side" when he attempted video visits from Westmoreland County Prison. *Id.* at 99, 109. Mr. Knox also relayed that when Father was transferred to SCI Albion, Mr. Knox contacted Father's counselor to request that Father put Child on the video visitation list. *Id.* at 97. Despite Father wanting video visits and making "attempts to set them up," Father has not had visitation with Child. *Id.* at 111.

According to Mr. Knox, Father last saw Child in 2020. *Id.* at 98. Mr. Knox stated, "[F]ather is incarcerated, was incarcerated at the time of [Child's] removal, and he has no release date coming up soon." *Id.* at 103.

At the time of the termination hearing, Child had been in WCCB's custody for 32 months. *Id.* at 8, 34, 103. Mr. Knox opined that termination would best serve Child's needs and welfare. *Id.* at 105. He explained that Child "is living [in Maryland] with [an] aunt and uncle. [Child is] thriving in her environment." *Id.* Mr. Knox stated that Child, along with her half-sister, had been in the pre-adoptive kinship placement for 13 months. *Id.* at 106. He added that Child is

> doing very well. She's doing well in school. Her attendance and grades are good. There's after-school activities, extracurricular activities. She's not having any behavioral issues in her school. They no longer feel the need to have her on an [individualized education program], as well. The teachers explained that she's a delight … and full of energy. She's been engaged in therapy and

- 3 -

adjusting well to her move to Maryland with her aunt and uncle.
She's just started karate, too.

*Id.* at 106.  Mr. Knox also noted that the caseworker in Maryland indicated Child was "doing well.  [Child is] very excited to see the caseworker when the caseworker arrives.  She's excited to show [the caseworker] her room and, basically, just show off to her." *Id.* at 107.

*Two Children's Institute Employees*

Angela Sluka testified to being employed by the Children's Institute as a "lead family skills specialist" who works "with mothers and babies who are born addicted." *Id.* at 14.  Ms. Sluka explained that in the summer of 2022, she attempted to facilitate Father's video visits with Child at Westmoreland County Prison. *Id.* at 15-16.  Ms. Sluka stated there "were several, multiple attempts.  However, there was a blank screen at every attempt." *Id.* at 15.

Christina Newcomer testified to working as a "family specialist" at the Children's Institute. *Id.* at 20.  Ms. Newcomer testified that she attempted to facilitate Father's video visits with Child in December 2022, when Father was incarcerated at SCI Albion. *Id.* at 21-23.  Ms. Newcomer contacted Father's counselor to ask that Child be "put on the list." *Id.* at 21-22.  According to Ms. Newcomer, no visits occurred because "the prisoner has to do it himself" and Child was not "added to the list." *Id.* at 22.

*SCI Albion Unit Manager*

Michael Snider testified to being a "unit manager" at SCI Albion. *Id.* at 26.  He explained that to have video visits with Child, Father had to submit

Child's name for review by the corrections counselor, who would send a letter to Child's parent or guardian requesting consent for the visits. *Id.* at 27-28. Mr. Snider stated, "Once that letter comes back from the parent or guardian, then that person is added to the visiting list." *Id.* at 28. Mr. Snider further testified that Father's earliest release date is 2027. *Id.* at 30.

*Father's Mother/Child's Grandmother*

Kimberley Harris, who is Father's mother and Child's grandmother, testified that she has a Zoom call with Child every Monday. *Id.* at 119. Ms. Harris stated that Child knows who Father is, and Father has "had any contact with [Child] he could." *Id.* at 120. According to Ms. Harris, Father's visits with Child, prior to Father's incarceration, were "a struggle" because of Mother, but Father "had a great relationship [with Child] any chance he could[.]" *Id.* at 120-21. Ms. Harris confirmed that Father has not seen Child since his incarceration; she stated that Father last saw Child in 2020, when Child "spent the weekend at our house." *Id.* at 121-22.

*Father*

Father testified remotely from SCI Albion, where he had been incarcerated since May 2022. *Id.* at 132. Father explained that he is serving a sentence for two separate cases. *Id.* at 130. He stated that his current sentence would "roll over" to his "new case" in February 2024. *Id.* Father testified that he enrolled voluntarily in a parenting program, and was on a waitlist for carpentry and construction training. *Id.* at 131.

Father testified that he was incarcerated for two years at Westmoreland County Prison before being transferred to SCI Albion. *Id.* at 132. He stated that he attempted to have video visits with Child from Westmoreland County Prison, but "there were issues with the system." *Id.* at 133. Father explained that he "wait[ed] for [Child] to appear on the screen" at "every visit that was scheduled." *Id.* Father also described difficulty with video visits from SCI Albion, which he addressed after "the unit manager brought to my attention exactly what I need to do." *Id.* at 134. Father stated he "wasn't exactly aware of how" to arrange video visits. *Id.* Father added that he made "it known I wanted to have contact with [Child]." *Id.* at 135.

Father confirmed he last saw Child in February 2020, "about three weeks before" he was arrested. *Id.* at 136. Father acknowledged that prior to Child's dependency, Mother had primary physical of custody of Child. *Id.* at 135. Nonetheless, Father stated he

> had a great relationship with [Child]. For the most part, I struggled being able to spend time with her a lot, due to [M]other … [who] made it really difficult for me, but the times that I did spend with [Child], we had great times together. I took care of her and we just bonded like daughter and father.

*Id.*

Father emphasized he loves Child and wants "everything to do with" her. *Id.* at 137. Father opposed termination, conceding that he has made mistakes, but while in prison, he "was trying to do everything I can to come home and be successful and take care of my daughter." *Id.* Father confirmed

he has had no contact with Child since his incarceration in March 2020, when Child was three years old. *Id.* at 136, 138. When the WCCB's counsel asked Father whether it was fair for Child to wait for Father "to be out of prison" and "get [his] life together," Father replied, "Not at all. I know it's not fair to her." *Id.* at 140.

*Child's Attorney*

Attorney Petonic stated Child "is in a very good place" with her "kinship foster family." *Id.* at 141. She opined that "it is certainly in [Child's] best interest to remain [with the kinship family] and to be adopted." *Id.* Attorney Petonic explained:

> [Child] has a more limited understanding of what adoption is because she[ is] only a young six-year-old. However, she wants her last name to be [the name of her pre-adoptive kinship family] and wants to continue to live there and calls it her forever home.
>
> This family has promoted the relationships with [Child's] siblings and with [M]other. They have followed all the requirements of the [WCCB]. [Child is] secure. [Child's] mental health needs are being met. It was not brought out in testimony, but [Child] has an ADHD diagnosis and [is] doing well. [The pre-adoptive kinship family is] following up with medical prescribers and assuring [Child gets] counseling. [Child] takes part in activities outside of school. That's where [Child] wants to remain.
>
> I certainly believe it's in [Child's] best interest.

*Id.* at 141-42.

The orphans' court found the WCCB presented sufficient evidence of grounds for termination of Father's parental rights under 23 Pa.C.S.A. § 2511(a)(1), (2) and (8) of the Adoption Act. Additionally, the court found

termination would serve Child's needs and welfare pursuant to Section 2511(b). The orphans' court terminated Father's parental rights on February 9, 2023. Father timely filed a notice of appeal and concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i).

Father presents the following question for review:

> I. Whether the trial court erred in finding by clear and convincing evidence that the Westmoreland County Children's Bureau met its burden under 23 Pa.C.S.A. § 2511(b)?

Father's Brief at 4.

Father claims the WCCB failed to meet "its burden with regard to [Section] 2511(b) because it is not clear whether there continues to be a bond between Father and Child." *Id.* at 10.

## Discussion

We review Father's claim for an abuse of discretion. ***In re Adoption of S.P.***, 47 A.3d 817, 826 (Pa. 2012).

> [O]ur standard of review requires [us to] accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.
>
> As [the Supreme Court] discussed in ***In re: R.J.T.***, [9 A.3d 1179, 1190 (Pa. 2010)], there are clear reasons for applying an abuse of discretion standard of review .... [U]nlike trial courts, appellate courts are not equipped to make fact-specific determinations on a

> cold record, where trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. ***R.J.T.***, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead, we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

***Id.*** at 826-27 (some citations omitted). The petitioner has the burden to provide clear and convincing evidence that its asserted grounds for termination are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009).

Termination of parental rights is subject to Section 2511 of the Adoption Act. ***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007). Under Section 2511, the orphans' court must engage in a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***Id.*** (citations omitted).

Father does not challenge the termination under Section 2511(a). Rather, he argues the WCCB

has not met its burden with regard to 2511(b) because it is not clear whether there continues to be a bond between Father and Child. Thus, Father's parental rights should not be terminated and the matter should be remanded for additional testimony regarding whether a bond exists.

Father's Brief at 10.

To the contrary, the WCCB asserts it "satisfied the evidentiary requirements" and presented clear and convincing evidence that termination is in Child's best interest. WCCB's Brief at 9. Child's attorney/guardian *ad litem* agrees with the WCCB. **See** Guardian *Ad Litem*'s Brief at 5.

<u>Section 2511(b) - Needs and Welfare</u>

When the court finds grounds for termination under Subsection 2511(a), it must then consider a child's needs and welfare.

> The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. ...

23 Pa.C.S.A. § 2511(b). "The plain language of Section 2511(b) clearly mandates that, in assessing the petition to terminate parental rights, the 'primary consideration' must be the child's 'developmental, physical and emotional needs and welfare.'" **Int. of K.T.**, 296 A.3d 1085, 1105 (Pa. 2023).

This Court has reiterated that intangibles "such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." **In re C.M.S.**, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Recently, the Pennsylvania Supreme Court stated:

[C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.

Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.

Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The court must consider whether [a child is] in a pre-adoptive home and whether they have a bond with their foster parents. …

*Int. of K.T.*, 296 A.3d at 1105–06 (citations and quotation marks omitted).

Father claims, "Because of the lack of contact between Father and Child due to no fault of his own, it is not clear whether a bond exists between Father and Child." Father's Brief at 13. Thus, Father requests reversal of the termination order and remand "for further testimony regarding any bond or lack thereof between Father and Child." *Id.*

The WCCB disagrees, asserting that the orphans' court properly considered Child's needs and welfare pursuant to Section 2511(b). WCCB's Brief at 10. The WCCB cites *In re K.Z.S.*, 946 A.2d 753 (Pa. Super. 2008), where this Court stated:

In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The

- 11 -

extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case.

*Id.* at 762–63.

Further, Child's attorney observes:

Father has not been able to care for [C]hild since his incarceration … and this incapacity will extend throughout the years left on his current sentence and the detainer. Moreover, Father has not had any contact with the Child since he entered prison.

[C]hild has lived with her kinship family since December 2021. She is thriving in this family's care, [and h]er best interests will be served by adoption by her kinship parents.

Guardian *Ad Litem*'s Brief at 5.

The record supports the orphans' court's finding that termination was in Child's best interest. We agree with Father that he was not responsible for most if not all of the failed video visits with Child from Westmoreland County Prison and SCI Albion. However, Father was responsible for the actions which resulted in him being incarcerated since March 2020, when Child was three years old. *See* N.T., 2/2/23, at 136, 138.

In *K.Z.S.*, we observed that a child's relationship with his mother "during their four years of almost constant separation must be fairly attenuated, given the circumstances of this case." *In re K.Z.S.*, 946 A.2d at 764. We noted:

No evidence suggests that [m]other has a strong bond with [child] equal to his bond with [his foster mother], that terminating [m]other's parental rights will sever an existing beneficial relationship, or that it will result in irreparable harm to [child]. Therefore, we agree with the court that the bond between [child]

and [his foster mother] is the primary bond to protect, given [child's] young age and his very limited contact with [his m]other.

*In re K.Z.S.*, 946 A.2d at 764.

Likewise, we agree with the orphans' court's consideration of Child's bond with her pre-adoptive kinship family. Child was 6 years old at the time of the termination hearing, and Father had been "incarcerated for a vast majority of the Child's life." Orphans' Court Opinion, 5/24/23, at 4. Attorney Petonic stated that Child "had limited understanding" of adoption, but "wants to continue to live" with her aunt and uncle in the pre-adoptive placement Child "calls her forever home." N.T., 2/2/23, at 141. The orphans' court summarized:

> Child is placed in a kinship foster home in the State of Maryland and is reportedly thriving, participating in extracurricular activities, doing well in school, and addressing mental health concerns in the foster home. The foster family has indicated that they are a pre-adoptive resource, which provides the Child with stability on the horizon.

Orphans' Court Opinion, 5/24/23, at 5. The court thus concluded "the best interest of the Child would be served through adoption …." *Id.* at 6.

Consistent with the foregoing evidence and law, the orphans' court properly considered Child's needs and welfare pursuant to Section 2511(b). As the court did not err, we affirm the order terminating Father's parental rights.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/20/2023